UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X

LEROY GIDRON

       Plaintiff,                   <u>MEMORANDUM AND ORDER</u>

   -against-                      Civil Action No.
                                       CV-05-2285(DGT)

NEW YORK CITY BOARD OF EDUCATION,

       Defendant.

--------------------------------X

Trager, J:

    <u>Pro se</u> plaintiff Leroy Gidron ("Gidron" or "plaintiff") brought this discrimination and retaliation action against his employer, the Board of Education of the City of New York ("Board" or "defendant"), for whom he worked as a school aide in Public School 156 ("P.S. 156") from 1991 until 2004.  Gidron makes three legal claims in this case.  He alleges that he was subjected to (1) sex-based discrimination in the form of failing to be hired for the position of permanent paraprofessional, (2) a hostile work environment, and (3) retaliation for engaging in a protected activity.  All of plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq.

    The Board now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) on all of plaintiff's claims.  For the reasons stated below, defendant's motion for summary judgment is granted.

1

## Factual and Procedural Background

Consideration of this motion for summary judgment requires construing the facts in the light most favorable to plaintiff, the non-moving party.[1] <u>Coosemans Specialties, Inc. v. Gargiulo</u>, 485 F.3d 701, 705 (2d Cir. 2007). Therefore, the following details are either undisputed or presented in the light most favorable to Gidron. The facts are extracted from four sources: (1) approximately 200 pages of exhibits attached to plaintiff's complaint, the majority of which are hand-written letters penned by plaintiff between 2001 and 2007; (2) miscellaneous employment-related documents he has collected and supplied; (3) plaintiff's deposition, taken October 17, 2006; and (4) defendant's filings, including declarations of Board of Education employees.

---

[1] Defendants submitted a statement pursuant to Local Civil Rule 56.1, asserting material facts that they claim are undisputed in this case. Defendants also provided actual notice to plaintiff, in accordance with Local Civil Rule 56.2, that plaintiff is required to respond to the motion for summary judgment pursuant to Fed. R. Civ. P. 56(e). As plaintiff did not respond in the form specified by the local rule, defendant urges this court to adopt all uncontroverted facts in its original 56.1 filing as true. Defendant's invitation is declined because plaintiff's <u>pro se</u> appearance warrants overlooking the technical requirement of this local rule. <u>See</u> <u>Holtz v. Rockefeller & Co., Inc.</u>, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."(citations omitted)). Therefore, factual assertions made by plaintiff in his submissions will be considered where they contest or conflict with defendants' statement of material facts. <u>See</u> <u>id.</u>

## Basis for Plaintiff's Failure-to-Hire Claim

Gidron, who is currently 43 years old, began working for the Board of Education as a school aide at P.S. 156 in Queens in October 1991. Deposition of Leroy Gidron, Oct. 17, 2006 ("Gidron Dep.") (attached as Ex. C to the Declaration of Zoë Davidson ("Davidson Decl.")), at 23. School aides perform non-pedagogical duties, including supervising students at lunch, recess and dismissal. Declaration of Noreen Little ("Little Decl.") (attached as Ex. I to Davidson Decl.) at ¶ 5. Gidron worked approximately four to five hours each weekday as a school aide. Gidron Dep. at 23, 29.

Between 1983 and 1999, Gidron was also employed by Sears. Id. at 11. From 1991 to 1999, Gidron scheduled his shifts at Sears around his daily schedule at P.S. 156. Id. at 29. Gidron resigned from Sears in 1999. Id. at 12.

Gidron currently holds several certificates of achievement from Sears, as well as degree diplomas qualifying him for work as a teacher's aide, paralegal assistant and private investigator. Id. at 55. Gidron received a high-school diploma in 1981. See Complaint, dated May 11, 2005 ("Compl."), Ex. 2 at 83. Gidron does not hold any other degrees or certificates. Gidron Dep. at 55.

While working as a school aide, Gidron aspired to become a

permanent paraprofessional.  Compl. Ex. 1 at 50-51.  Permanent

paraprofessionals are also employed within New York City public

schools by the Board.  Declaration of Linda Zimmerman ("Zimmerman

Decl.") (attached as Ex. K to Davidson Decl.) at ¶ 9.  The record

does not include a description of the exact responsibilities that

a permanent paraprofessional performs.

In pursuit of a permanent paraprofessional position, Gidron

communicated with Board employees at both P.S. 156 and the

Board's Department of Human Resources.  Gidron Dep. at 73.

However, Noreen Little ("Little"), the principal of P.S. 156

since August 2000 and Gidron's boss, repeatedly informed Gidron

that he did not meet the qualifications of a permanent

paraprofessional because permanent paraprofessionals were only

hired from a list of eligible substitute paraprofessionals, and

Gidron was not a substitute paraprofessional.  Little Decl. at ¶

9.[2]  Many others with whom Gidron interacted also conveyed this

information.[3]

--------------------------------

[2] On August 31, 2001, however, Little nevertheless endorsed
Gidron's request, drafting a letter asking that Gidron be
considered for the paraprofessional position, as he had been
waiting for such a position for over five years.  Compl. Ex. 1 at
12.

[3] For instance, on February 13, 2003, Barbara Restivo, the
Director of the Board's Bureau of Paraprofessionals and Hourly
Non-Competitive Appointments, notified Gidron via letter that he
did not meet the qualifications for the permanent
paraprofessional position.  Her letter references other letters
written in the past to the same effect, although they are not in
the record.  Compl. Ex. 2 at 115.  Likewise, in a letter written

Under standard Board procedures, permanent paraprofessional positions are filled by substitute paraprofessionals as follows: (1) the principal of the school with a vacancy notifies the regional office; (2) the regional office contacts the Director of the Substitute Paraprofessional Registry ("Registry"); (3) the Registry assigns a substitute paraprofessional to work within the school for an observation period of approximately 5 to 10 days; and (4) upon the principal's approval, the substitute paraprofessional is processed for the permanent position. Zimmerman Decl. at ¶ 9.[4]

The Registry contains the names of persons qualified to serve as substitute paraprofessionals. Id. at ¶ 1. A qualified substitute paraprofessional is required to have a high-school diploma, to have passed a tuberculosis examination, and to have submitted a completed application for the position. Id. at ¶ 3.

---

after his 2004 resignation, Gidron explained: "I was always told by the District 29 office, the Principals, and supervisor that I had to resign as a School Aide, be placed on the sub para list at the School or District office and start substituting." Compl. Ex. 1 at 66. Lastly, Gidron alluded to attending a meeting at which all school aides were present and informed of the hiring process for permanent paraprofessionals. Gidron Dep. at 71-72.

[4] Until 2006, substitute paraprofessionals were selected from the Registry to fill permanent positions according to seniority, as measured by total days worked. Zimmerman Decl. at ¶ 6-7. In 2006, the Board modified its bright-line seniority requirement, and has since allowed substitute paraprofessionals who have worked for either twenty-five days, or been on the Registry for three months, to be considered for vacant permanent paraprofessional positions, irrespective of overall seniority. Id. at ¶ 11.

As of 2004, applicants must have also passed either the New York State Assessment of Teaching Assistant Skills test ("NYSATAS") or the Liberal Arts and Sciences Test ("LAST"), and have completed two workshops. Id. at ¶ 10.

Importantly, substitute paraprofessionals fill day-to-day absences on a short-term basis and must therefore be available on short-term notice. Id. at ¶ 4. Consequently, they may not hold another job while listed on the Registry. Id.

Gidron understood these hiring procedures, but he did not want to give up his existing job, and so he continued to work as a school aide until his September 15, 2004 resignation took effect on October 1, 2004.[5] All the while, he continuously asked to be hired for the permanent paraprofessional position. See, e.g., Compl. Ex. 1 at 10, 11, 15, 55.

Consequently, although Gidron waged a "12-year fight" for the job, the Board never hired him as a permanent paraprofessional. Compl. Ex. 1 at 50. Gidron also never worked as a substitute paraprofessional. Gidron Dep. at 47. Gidron claimed that from 1992 through 2003, his name appeared on the Registry as an available substitute paraprofessional. Id. But according to Charles Peeples ("Peeples"), the Board's Human

---

[5]See Gidron Dep. at 74, where Gidron testified:
A: She said they put my name on the [substitute] list.
Q: And then your job was to wait?
A: Yes. But, see, I didn't. I didn't have a job so I continued working as a school aide.

Resources Director for the Borough of Queens, there is no record
that Gidron ever submitted a completed application to the
Registry or was ever listed as an available substitute
paraprofessional.  Declaration of Charles Peeples ("Peeples
Decl.") (attached as Ex. J to Davidson Decl.) at ¶¶ 8-9.[6]

Gidron alleges that during the time period in question, the
Board promoted females with fewer qualifications and less
experience than himself to fill vacant permanent paraprofessional
positions.[7]  Gidron named three such females who he believed were
promoted from school aides to permanent paraprofessionals: Maddie
Dagracia, Paulette Carter and Mary Constant.  Gidron Dep. at 44.
Gidron did not, however, know whether any of the females had in
fact satisfied the prerequisites for the position, whether any
had first served as a substitute paraprofessional, or when any of
them had actually become permanent paraprofessionals.  Id. at 45.
Gidron also recounted the transfer of one paraprofessional, Terry

---

[6] Gidron's testimony suggests that, although he asked to be
placed on the registry, he never took the steps required to place
his name on the list.  See Gidron Dep. at 65 ("Q: What other
steps have you taken to become a paraprofessional? A: Basically,
that's it besides going to the schools and telling them that I
wanted to be on the para list.").

[7] See Compl. Ex. 1 at 56 (November 10, 2004 fax from Gidron
to Chancellor Joel Klein complaining that "whenever there is an
opportunity for it to happen I am overlooked and the position
goes to someone that seems is known or liked by the building
administration most of the time it is a woman.  I understand that
the majority of the staff is female but there are few men to be
considered").

Price, from another school into P.S. 156 to fill a vacancy there. Compl. Ex. 1 at 57; Gidron Dep. at 92.

According to Principal Little, Ms. Price met all of the qualifications for the paraprofessional position, including having served as a substitute. Little Decl. at ¶ 16. Ms. Dagracia and Ms. Carter never worked at P.S. 156 during Little's tenure. Id. at ¶¶ 19-20. Little also mentions another female paraprofessional at Gidron's school, Ms. Hughes, who "[u]nlike plaintiff . . . met all of the qualifications for the position." Id. at ¶ 23.

Gidron also acknowledged that the Board hired males as permanent paraprofessionals. Gidron Dep. at 97. Specifically, Gidron recalled that two males, Cletus Stewart[8] and Kevin Gillette, both worked as permanent paraprofessionals in P.S. 156 during the time period in question. Id. at 96-97.

---

[8] When Cletus Stewart grew ill in September 2004 and later passed away, Gidron expected to receive his permanent position, although Gidron still had not worked as a substitute paraprofessional, and no longer worked for the Board, as he had resigned his position in September. Gidron Dep. at 118. According to Little, no one replaced Mr. Stewart in 2004, due to a district-wide hiring freeze on permanent paraprofessionals. Little Decl. at ¶ 22. Gidron was made aware of the hiring freeze at least as early as November 2004 by representatives in Human Resources. Gidron Dep. at 128-29.

## Plaintiff's Hostile Workplace and
## Gender Discrimination Claims

Gidron also makes a variety of claims regarding the working conditions at P.S. 156.  These span a number of years, often involving unrelated incidents.  Construing the facts in the light most favorable to Gidron, all details that might support his hostile workplace claims are listed chronologically.

According to Gidron, at an unspecified date prior to 2001, Quessie Fairley ("Fairley"), who worked as a supervising school aide and was Gidron's immediate supervisor, instructed all school aides to break up fights between students.  Gidron Dep. at 75. Gidron felt that in reality, however, this directive only applied to male school aides, while females "didn't really have to go and break up the fights."  Id.  Principal Little contends that school aides are not expected to intervene in fights between students. Little Decl. at ¶ 5.  Gidron does not describe any occasions in which he, or other male school aides, broke up fights.  Gidron also fails to cite any incidents where female school aides were not required to break up fights.

On October 12, 2001, Gidron had a physical altercation with a fifth-grade student named Kendra Coleman ("Coleman").  In a hand-written letter dated October 21, 2001, Gidron says that the altercation started when Coleman responded to Gidron's orders for her to leave a particular area of the school by swinging her arms

9

and slapping his face. Compl. Ex. 1 at 1. In response, Gidron defensively took hold of Coleman's arms and held them tightly to avoid additional blows. Id. He also maneuvered Ms. Coleman's hands towards her mouth whenever she would try to bite him. Id. In a separate letter and in his deposition, Gidron acknowledged that during the altercation he also pushed Coleman onto the ground because she laughed at him and slapped him in the face. Id. at 6; Gidron Dep. at 89-90.

At Coleman's request, an investigation commenced into Gidron's act of pushing her onto the ground. On October 15, 2001, Principal Little informed Gidron that she had concluded that Coleman's allegation of corporal punishment was substantiated, and a letter reflecting this was placed into Gidron's file. Compl. Ex. 1 at 3.

Gidron says he was denied an opportunity to present a student witness who would testify on his behalf in the investigation. Id. at 57. Gidron also claims that Fairley, the female school aide who was Gidron's supervisor, was allowed to present the testimony of a sixth-grade student witness when she was investigated for allegedly slapping a third-grade boy in the face in March 2003. Id. However, at his deposition, Gidron acknowledged that he did not actually know whether or not Fairley was charged with corporal punishment, whether or not she received a letter in her file regarding corporal punishment, or whether

10

anyone had ever spoken with Fairley about the incident in which she was involved. Gidron Dep. at 91. The record is silent as to these issues.

In his deposition, Gidron alleged that female school aides generally received more time off than men to do "special things." Gidron Dep. at 119. However, he also admitted that he himself had never personally requested time off. Id. He also did not know whether or not other male school aides requested or took time off. Id.

Gidron also claimed that he received a series of negative evaluations as a result of his refusal to accept additional hours as an "accountability" school aide in 2002. See Gidron Dep. at 108; Compl. Ex. 1 at 60-61 ("I have been receiving bad evaluations since I had refused the job as the accountability person for lunch."). Although the record is unclear on this point, it appears that the "accountability" position involved working an extra hour during lunch in the schoolyard tending to students. Compl. Ex. 1 at 61. Gidron turned down the extra hours because he felt that another school aide wanted the hours and deserved them more than he did. Id. at 58. At the same time, Gidron was upset that he could not work additional hours, other than the assignments being offered by his supervisors. See id. (Gidron's complaint that he was "not allowed to get more hours unless it is something that the Principal Ms. Little or

Supervising School Aide Ms. Fairley wants me to do").

To demonstrate that his evaluations were negatively affected by his refusal to work in the accountability position, Gidron submitted copies of his annual evaluations for the years 1992 through 2004. Compl. Ex. 2 at 95-109. Each evaluation sheet is a single hand-written sheet that ranks fifteen individual categories, which are then followed by a single "overall" ranking. Id. These demonstrate that Gidron was consistently ranked as a "satisfactory" employee. Id. On two instances, Gidron received unsatisfactory rating within an individual category:

- On May 20, 2002, in an evaluation prepared by Little, Gidron's "attendance" was unsatisfactory, as he had been absent for two months.[9] His overall rating was still satisfactory. Id. at 107.

- On June 7, 2004, Little's evaluation of Gidron noted that his "ability to relate to others" was unsatisfactory because he became "argumentative with co-workers and students." Id. at 109. Under "additional comments," Little noted that Gidron failed to call in absences early enough to allow the office to cover his shift, although his attendance ranking was

---

[9] Elsewhere, Gidron alludes to his having taken a two-month leave from his position in order to care for his ailing father's health. Compl. Ex. 1 at 67.

still satisfactory.  _Id._  Beside his signature on the
evaluation, Gidron wrote, "only when provoked within
reason."  _Id._

Only one other evaluation contained an additional comment:
on his May 27, 2003 evaluation, prepared by Little, Gidron's
attendance and overall rating were satisfactory, but the
"comments" box noted that he had failed to call to report
absences in a timely fashion.  _Id._ at 108.  None of the
evaluations allude to Gidron's refusal to accept hours in the
accountability position.

Gidron also complained of several additional events related
to his allegedly hostile workplace.  In April 2002, Fairley
notified Gidron that she had received complaints from other staff
members regarding the scent of his breath.  Gidron Dep. at 84.
In December of that same year, Fairley notified him that she had
received staff complaints concerning his body odor.  Gidron
confronted "every school aide" but could not determine the source
of these complaints.  _Id._

In December 2003, Fairley prevented Gidron from using a cane
during his working hours.  Compl. Ex. 1 at 61.  Gidron wanted to
use the cane because his leg ached as a result of having been
shot in 1992.  _Id._; Gidron Dep. at 51.  Gidron believed that
female teachers who had "gotten hurt" were allowed to use canes,
although he also believed that was "probably" the result of their

13

having a disability from being in an accident.  Gidron Dep. at
80; Compl. Ex. 1 at 61.  Gidron never requested an accommodation
from the Board's medical division to use a cane.  Gidron Dep. at
80.  The record is silent on the circumstances under which use of
a cane by a school aide is generally permitted.

When Fairley prevented Gidron from using his cane, Gidron
left for the day and went home.  Gidron Dep. at 82; Compl. Ex. 1
at 61.  On a later date, he and Fairley had a "heated discussion"
about his leaving that day, wherein both parties "almost wanted
to go for blows."  Gidron Dep. at 83.  Gidron told Little about
the confrontation, but no additional actions were taken in
response to it.  Id. at 84.  Gidron felt that the incident
involving the cane constituted "harassment" because other people
were allowed to use canes while he was not.  Id. at 85.  Gidron
believed Fairley refused to let him use the cane because she felt
that he did not respect her.  Id.

On an unspecified date, Gidron had a "heated exchange" with
a school security guard.  Id. at 77.  During the exchange, the
guard called Gidron a "faggot."  Id.  Gidron never complained
about this incident to anyone in the school's administration.
Id.  As a result of the incident, Gidron claims that students
began saying that he was gay.  Id.  Gidron did not recall whether
teachers or other members of the administration ever called him
gay.  Id. at 79.

14

**Plaintiff's "Grievance," Resignation and Efforts to Rescind**

On September 7, 2004, Gidron addressed a letter that he labeled "Formal Grievance" to the attention of Little and "Mr. A. Williams," whom he identifies as a representative from the United Federation of Teachers.  Compl. Ex. 2 at 33.  The hand-written letter includes the following claims:

- In 2003, Gidron was overlooked for a permanent paraprofessional position that was given to Terry Price.

- Gidron consulted his union (DC-37) and learned that they would not represent him in his struggle to obtain a permanent paraprofessional position.

- Consequently, Gidron sought representation from the United Federation of Teachers, as they represent permanent paraprofessionals.

- Gidron claimed to have discovered a document indicating that when he was originally hired by the Board in 1991, it was as a permanent paraprofessional and not as a school aide.[10]

- Based on the document, Gidron intended to seek back-pay

---

[10] This document does not appear in the record.  Little states that the Board's records show that Gidron was hired in 1991 as a school aide and never worked as a permanent paraprofessional.  Little Decl. at ¶ 15.

wages as a permanent paraprofessional for the period of
time between 1991 and 2004.

The "grievance" does not contain any allegations of or allusions
to discrimination.

Gidron tendered a letter of resignation to the Board exactly
one week later, on September 15, 2004, effective October 1, 2004.
Compl. Ex. 2 at 3.   The letter explains that Gidron decided to
resign his position because he hoped to be placed on the Registry
in order to become a permanent paraprofessional.   Id.   The letter
references two previous occasions on which Gidron announced his
resignation as a school aide, both of which he later rescinded.
Id. at 4.   The letter also mentions the 1991 document allegedly
indicating that Gidron was originally hired as a permanent
paraprofessional.   Id. at 5.   The letter makes no mention of
Gidron's having filed a grievance, nor does it refer to any
gender-based discrimination or harassment within the workplace.[11]

In his deposition, Gidron claimed that his resignation was
prompted in part by the Board's neglecting his "grievance" dated
September 7, 2004.   Gidron Dep. at 93.   Gidron also attributed
his resignation to his feeling that he had been "overlooked" for
so long, and his frustration that women were receiving jobs that

_____

[11] The letter concludes with Gidron's claim that not being
hired as a permanent paraprofessional "is causing much job
related stress and it can lead to my death. . . . Also in my
files there are many courses that I have taken to prove that I
qualify for the job."   Id. at 5.

16

he was not receiving, Gidron Dep. at 95, although the grievance letter itself did not raise any complaints about gender discrimination, Compl. Ex. 2 at 33-34. There was no final outcome with regard to the grievance, as Gidron resigned one week after filing it.[12]

Principal Little states that she never received Gidron's grievance letter in September 2004, although she did receive his subsequent letter of resignation on September 15, 2004. Little Decl. at ¶¶ 26-27. Little was informed by the Board of Gidron's grievance in the course of this litigation. Id. At the time of Gidron's resignation, Little understood that he was resigning in order to pursue a paraprofessional position. Id. at ¶ 28. Little also states that "[o]n the day I received [Gidron's] resignation letter, and throughout September 2004, I tried to discourage plaintiff from resigning because I knew that there were no permanent Paraprofessional positions available at P.S. 156Q. I was informed by Human Resources that there was a hiring freeze on permanent Paraprofessional positions. I did not want him to leave because he was one of my better School Aides." Id. at ¶ 29.

On October 24, 2004, Gidron received a letter from his insurer notifying him that his medical benefits had terminated

---

[12] See Gidron Dep. at 95 ("Q: What was the outcome of the grievance? A: There was no outcome because I left. There was no outcome.").

with the end of his employment.  Compl. Ex. 2 at 24.  On November

10, 2004, Gidron drafted a letter seeking assistance from New

York City Schools Chancellor Joel I. Klein.  Id. at 23.  In this

letter, Gidron referred to himself as having been "fired" from

P.S. 156.  Id. at 24.

On December 5, 2004, Gidron lost a hearing on his

eligibility for unemployment compensation.  Gidron Dep. at 107.

On December 6, 2004, Gidron returned to P.S. 156 and asked for a

time-card, so that he could begin working as a school aide again.

Id.  He learned that there was no time-card for him.  Id.

Later that day, Gidron addressed a letter to Peeples, the

Board's Human Resources Director for the Borough of Queens,

requesting to rescind his resignation.  Id. at 107.  Gidron also

began to visit the District Office in person and to make

telephone calls from home to the Board in order to rescind his

resignation.  Id.  Phone records submitted by Gidron indicate

that he placed in excess of forty calls to the Board during

November and December 2004.  See Pl.'s Aff. in Opp. to Mot.,

dated May 14, 2007.  These calls were often placed in the middle

of the night.  Gidron Dep. at 101.  Eventually, Gidron learned

that his school aide position would not be reinstated.  He also

learned that he had been banned from the P.S. 156 building at the

instruction of the District Office.  Id. at 103-104.

Once a school aide resigns, his reinstatement is contingent

on approval from the district office. Peeples Decl. at ¶ 16.
According to Peeples, Gidron left several voice-mail messages in
the middle of the night that lasted in excess of fifteen minutes,
containing "incoherent ramblings." Id. at ¶ 18. Peeples decided
that Gidron would not be rehired due to the volume of telephone
calls, and the content of the messages. Peeples Decl. at ¶ 18.
Peeples notified both Gidron and Little that for those reasons
Gidron was not to be reinstated. Id. at ¶ 17.


### (4)

### Plaintiff's EEOC Complaint and the Current Suit

On March 15, 2005, Gidron filed a complaint with the EEOC.
Compl. Ex. 1 at 50. Gidron checked boxes on an EEOC Intake
Questionnaire alleging harm as a result of (1) failure to be
hired, promoted and/or transferred, (2) discipline,
(3) harassment and (4) "other." No "other" harms were specified.
Id. at 40. Gidron claimed that these harms were the result of
sex-based discrimination and retaliation. Id.

In a box supplied to contain a written narrative, Gidron
reiterated his allegation that the Board repeatedly failed to
hire him as a permanent paraprofessional. Id. at 50. Gidron
alleged that he endured "lots of harassment and discriminatory
acts," which eventually "forced" him to resign. Id. Gidron also
stated that the main reason he resigned was because he wanted his

name added to the Registry, and he knew that forfeiting his school aide position was necessary to achieve that.  Id.  Gidron explained that he later attempted to rescind his resignation, making "over 40 calls" to the District Office, but on December 7, 2004, he learned from Peeples that he would not be reinstated as a school aide.  Id. at 51.

On April 11, 2005, after investigating Gidron's charges, the EEOC rendered a determination finding it unlikely that the devotion of additional resources into Gidron's complaint would reveal a violation.  Id. at 48-49.  The EEOC issued Gidron a "Right to Sue" letter on April 11, 2005.  Id. at 47.

Gidron filed the instant suit on May 11, 2005 under Title VII of the Civil Rights Act of 1964, alleging that the Board discriminated against him on the basis of his sex or gender. Gidron specifically raised claims alleging (1) failure to hire, (2) failure to promote, (3) unequal terms and conditions of employment and (4) retaliation.  Defendant filed the current motion for summary judgment on June 8, 2007.

### Discussion

### (1)

### Timeliness of Claims

The Board asserts that claims prior to May 19, 2004 are time-barred because they occurred more than 300 days prior to the

filing of Gidron's EEOC complaint.

In order to maintain a Title VII action, a plaintiff must file a timely complaint with the EEOC.  Francis v. Chemical Banking Corp., 62 F.Supp.2d 948, 959 (E.D.N.Y. 1999).  New York courts require a charge of discrimination be filed with the EEOC within 300 days of the unlawful employment action.  Id. Discriminatory incidents falling under Title VII not timely charged before the EEOC will be time-barred upon the plaintiff's suit in district court.  Quinn v. Green Tree Corp., 159 F.3d 759, 765 (2d Cir. 1998).

Gidron's charge to the EEOC is dated March 15, 2005. Consequently, any incidents occurring before May 19, 2004 would ordinarily be time-barred from being considered in this action.

The Second Circuit does recognize one exception to this statute of limitations, however.  "Upon a showing of compelling circumstances," a continuing violation exception to the Title VII limitations period may be made.  Quinn, 159 F.3d at 765-66; Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1997).  But this exception requires evidence of "specific discriminatory practices, such as the repeated use of discriminatory seniority lists or employment tests."  Lightfoot, 110 F.3d at 907.  That is, the acts alleged in the complaint must have been "continuous in time with one another or with the timely acts [plaintiff] has alleged."  Quinn, 159 F.3d at 766.  Any

discontinuity is "fatal" to a continuing violation argument. <u>Id.</u>
"[M]ultiple incidents of discrimination, even similar ones, that
are not the result of a discriminatory policy or mechanism do not
amount to a continuing violation." <u>Lambert v. Genesee Hosp.</u>, 10
F.3d 46, 53 (2d Cir. 1993).

In this case, a number of Gidron's allegations concern
discrete and non-overlapping incidents, separated in time by
months in some instances and years in others. No evidence tends
to conflict with the conclusion that this discontinuity is fatal.
Accordingly, all such claims occurring before May 19, 2004 must
be barred. These include Gidron's allegations that:

- In 2001, he was not allowed to present student witness
  testimony pursuant to the corporal punishment
  investigation concerning his altercation with Coleman.

- In April and December 2002, Fairley notified him that
  she had received complaints about his breath and body
  odor.

- On May 20, 2002, he received an evaluation that listed
  his attendance as "unsatisfactory."

- On May 27, 2003, he received an evaluation that
  contained comments indicating that he failed to report
  absences in a timely fashion.

- In December 2003, Fairley prevented him from utilizing
  a cane during work hours.

Each of these allegations concern discrete and non-continuous occurrences.  Gidron has failed to show any facts to support a conclusion that any of these actions were part of a discriminatory policy directed towards himself in particular or male school aides in general.  Accordingly, the continuing violations exception does not apply.  See Plumey v. New York State, 389 F. Supp. 2d 491, 499 (S.D.N.Y. 2005) (refusing to extend the statute of limitations where the plaintiff alleged discrete acts that were isolated in time).  Therefore, only those claims concerning events that occurred after May 19, 2004 are potentially actionable here, although the prior events may still be considered as evidence to assist in the evaluation of discriminatory intent.

## (2)

### Exhaustion of Administrative Remedies

The Board also argues that many of Gidron's claims are barred because Gidron failed to pursue and exhaust his administrative remedies prior to filing a judicial complaint, which is a pre-requisite in a Title VII action.[13]  See Francis v.

---

[13] See Deft.'s Mem. in Supp. of its Mot. for Summ. J. at 4 (arguing for dismissal of plaintiff's claims including: "corporal punishment; absences; complaints about bad breath and body odor; comments regarding plaintiff's sexual orientation; use of a cane; time off; having to break up fights; 'banishment' from school grounds after resignation; and receiving an unsatisfactory rating in June 2004 on his yearly evaluation").

City of New York, 235 F.3d 763, 768 (2d Cir. 2000).  In light of
the previous discussion, the majority of these claims are time-
barred.  But Gidron's claims regarding his June 2004 evaluation
and banishment from school grounds are not time-barred, and are
reasonably related to the claims specified in Gidron's EEOC
charge, and so survive.

A plaintiff must, as a general rule, exhaust administrative
remedies as a precondition to filing a Title VII suit.  Francis,
235 F.3d at 768.  This requirement gives "the administrative
agency the opportunity to investigate, mediate, and take remedial
action."  Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2nd
Cir. 1998) (quoting Stewart v. INS, 762 F.2d 193, 198 (2d Cir.
1985)).  However, an exception is that claims which are
"reasonably related" to the EEOC charge may be brought in a
subsequent federal court action.  See Williams v. New York City
Housing Auth., 458 F.3d 67, 70 (2d Cir. 2006) (citing Butts v.
City of New York Dep't of Housing Preservation and Dev., 990 F.2d
1397, 1401 (2d Cir. 1998)).  A claim is considered reasonably
related "if the conduct complained of would fall within the scope
of the EEOC investigation which can reasonably be expected to
grow out of the charge that was made."  Williams, 458 F.3d at 70
(quoting Fitzgerald v. Henderson, 251 F.3d 345, 359-60 (2d Cir.
2001)).

Although Gidron failed to raise every allegedly

discriminatory incident in his EEOC charge against the Board,
they are all "reasonably related" to his general allegations of
discrimination and harassment in the workplace.  An EEOC
investigation of Gidron's complaint would have assessed his
treatment by Little, including his June 2004 evaluation, as well
as the circumstances of his resignation and the details
surrounding his attempts to rescind it.  These inquiries would
have been required in order to determine whether Gidron's
discrimination and harassment complaints were meritorious.
Therefore, all of Gidron's non-time-barred allegations, even if
not specifically cited in his EEOC complaint, will be considered
in support of his claims.

### (3)

### Gender Discrimination

The Board moves for summary judgment pursuant to Federal
Rule of Civil Procedure 56(c), arguing that Gidron fails to
produce evidence that could support a claim of gender
discrimination under Title VII.

Gidron alleges that the Board failed to hire him as a
permanent paraprofessional in violation of Title VII.  Title VII
of the Civil Rights Act of 1964 provides, in relevant part, that
"[i]t shall be an unlawful employment practice for an employer
... to discriminate against any individual with respect to his

compensation, terms, condition, or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a).

Gidron's employment discrimination claims are governed by the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  To bring his claim successfully, Gidron must first establish a "de minimis" prima facie case of discrimination.  <u>Joseph v. Leavitt</u>, 465 F.3d 87, 90 (2d Cir. 2006).  If this burden is met, then the burden shifts to the Board to articulate legitimate and nondiscriminatory reasons for not hiring Gidron.  <u>Id.</u>  If the Board does so, the burden shifts back to Gidron, who must provide evidence adequate to survive summary judgment that the Board's proffered reasons are pretextual and that the Board was actually motivated, in whole or in part, by discrimination.  <u>Id.</u>

In order to establish a prima facie case of discrimination in hiring, Gidron must show that: (1) he is a member of a protected class; (2) he applied and was qualified for the job; (3) he was rejected; and (4) the denial occurred under circumstances giving rise to an inference of discrimination. <u>Ganthier v. N. Shore-Long Island Jewish Health Sys.</u>, 345 F. Supp. 2d 271, 275 (E.D.N.Y. 2004).  Although these requirements are minimal, Gidron has not presented evidence sufficient to satisfy either the second or fourth prongs of this prima facie case.

First, Gidron has not satisfied the second prong of this test because he has not shown that he was qualified to be a permanent paraprofessional. Until October 1, 2004, Gidron's employment as a school aide barred his eligibility for addition to the Registry as a qualified substitute paraprofessional. Because Gidron never worked as a substitute paraprofessional, he was not eligible for appointment as a permanent paraprofessional. Therefore, Gidron was not qualified for either the substitute or permanent position between 1991 and October 2004.

Gidron's resignation on October 1, 2004 lifted one bar to his becoming a permanent paraprofessional. However, there is no evidence that Gidron ever completed the application required to be added to the Registry. Therefore, Gidron remained unqualified for both positions even after his resignation.

Gidron's ineligibility is cemented by the fact that, as of 2004, the Board required its candidates to pass either the NYSATAS or the LAST. Gidron has not passed either examination. Furthermore, Gidron has not attended the two-day workshops that were also required beginning in 2004. Therefore, Gidron has never been qualified for either the substitute or permanent paraprofessional position, before or after his resignation.

Gidron has also failed to satisfy the fourth prong of this test, because he failed to supply evidence that the Board's staffing decisions support an inference of discrimination. The

Board asserted that it only hired candidates who had worked as substitute paraprofessionals to be permanent paraprofessionals. There is no evidence in the record to the contrary, and Gidron never worked as a substitute paraprofessional.

In order to show an inference of discrimination, Gidron must demonstrate that he was treated differently than female candidates who were "similarly situated in all material respects." Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997). Gidron has provided no evidence indicating that women who had not served as substitute paraprofessionals were hired by the Board as permanent paraprofessionals. Gidron made conclusory statements indicating his belief that more women than men staffed permanent paraprofessional positions, but conclusory statements without evidence are an insufficient basis on which to state a claim of discrimination. See Bickerstaff v. Vassar Coll., 196 F.3d 435, 451 (2d Cir. 1999).

Gidron has complained that women who had not worked for the Board for as long as he had received the position instead of him. But working for the Board - as a school aide, teacher or any other position aside from a substitute paraprofessional - is not a precondition for becoming a permanent paraprofessional. Gidron's twelve-year tenure as a school aide had no bearing on his eligibility for that position. Because Gidron has provided no evidence demonstrating that any female candidate who received

the permanent paraprofessional position had (1) no experience as a substitute paraprofessional and (2) no qualifications to serve as a substitute paraprofessional, Gidron has failed to satisfy this prong.

Assuming arguendo that Gidron succeeded in stating a prima facie case, then the burden would have shifted to the Board to supply a legitimate non-discriminatory reason for not hiring Gidron. The Board has successfully met that requirement. After Gidron resigned his school aide position, he immediately commenced calling the Board at all hours of the day, leaving lengthy voice messages in the middle of the night. Gidron's most recent evaluations evinced an inability to get along with co-workers and a recurring failure to report to work in a timely fashion, a quality that is important for substitute paraprofessionals, who receive assignments on short notice. These factors cumulatively led Peeples to determine that the Board would not rehire Gidron in any capacity. These are all legitimate and non-pretextual reasons for failing to hire Gidron. Gidron has failed to provide any evidence to suggest that the Board's non-discriminatory rationale is pretextual.

In sum, there is nothing in the record from which a reasonable juror could infer a discriminatory motive based on gender. Taking all of Gidron's allegations as true and granting all reasonable inferences in his favor, there is no evidence of

gender discrimination.  As such, Gidron has failed to prove his prima facie case.  Even assuming that he had, Gidron has done nothing to rebut the legitimate, non-discriminatory reasons that the Board has proffered for his termination.

Accordingly, the Board's motion for summary judgment on Gidron's Title VII gender-discrimination claim is granted.


**(4)**

**Hostile Work Environment**

The Board also moves for summary judgment on Gidron's hostile work environment claim.  As an initial matter, nearly all of Gidron's allegations under this claim occurred before May 19, 2004 and are thus time-barred, including his allegations that he was denied the benefit of introducing witness testimony into his corporal punishment investigation; that he received complaints about his breath and body odor; and that he was not allowed to utilize a cane.

But even if these claims were reviewed on the merits, the same result would follow.  Under Title VII, a hostile work environment exists where "the workplace is permeated with discriminatory intimidation, ridicule, and insult [based on, <u>inter alia</u>, sex] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  <u>Schiano v. Quality Payroll Sys.</u>,

445 F.3d 597, 604 (2d Cir. 2006) (quoting <u>Harris v. Forklift</u> <u>Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted)). The workplace must be viewed as hostile both from the perspective of an objective reasonable person and from the victim's subjective viewpoint. <u>Alfano v. Costello</u>, 294 F.3d 365, 374 (2d Cir. 2002). The conduct that creates such an environment must be motivated by the plaintiff's gender or another protected characteristic. <u>Brown v. Henderson</u>, 257 F.3d 246, 252 (2d Cir. 2001).

Gidron's hostile work environment claim fails because Gidron cannot show that (1) he was subjected to an objectively hostile work environment, or (2) that he was subjected to such an environment because of his gender.

"As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." <u>Alfano</u>, 294 F.3d at 374 (internal quotations and citations omitted). As previously discussed, nearly all of Gidron's allegations concern isolated events. Moreover, none of the singular incidents about which Gidron complains are sufficiently severe to warrant a finding of harassment under Title VII. See <u>Alfano</u>, 294 F.3d at 380. Therefore, Gidron's work environment cannot be considered objectively hostile.

Furthermore, Gidron has failed to produce evidence that any of the events about which he complains were motivated by his gender. For example, Gidron's allegations that female school aides received more vacation time than men and that male school aides were expected to break up fights more often than females are based simply on his conclusions and lack any factual support. It is axiomatic that "'[i]t is not sufficient merely to assert a conclusion without supplying supporting arguments or facts.'" BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996) (quoting SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978)). In addition, Gidron has acknowledged that his problems in the workplace were caused by interpersonal issues, rather than gender discrimination. For example, Gidron himself attributed his problems with his supervisor Fairley to her belief that he did not respect her. See Gidron Dep. at 85-86.[14] When asked directly whether he perceived these events as motivated by gender, Gidron merely replied, "[i]n a way." Id.

Plaintiff's hostile workplace claims lack any merit. Therefore, the Board's motion for summary judgment on these

---

[14] Referring to the cane and comments regarding his breath and body odor, Gidron testified:
A: I think it was some kind of retaliation, you know.
Q: Retaliation for what?
A: I thought it was retaliation for the fact that maybe I didn't -- maybe she felt I didn't respect her. Maybe she felt I didn't respect her.

claims is also granted.  See Brown, 257 F.3d at 256 (granting summary judgment on Title VII claim where "there is overwhelming evidence that the hostility toward [plaintiff] was grounded in workplace dynamics unrelated to [plaintiff's] sex").

## (5)

### Retaliation

Lastly, the Board moves for summary judgment on Gidron's claim of retaliation in violation of Title VII.  In order to make out a prima facie case of retaliation under Title VII, Gidron must show (1) that he was engaged in a protected activity; (2) that his employer was aware of that activity; (3) that he suffered an adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action.  Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006).  The record, when viewed in the light most favorable to Gidron, includes the bare minimum of evidence needed to establish this prima facie case.  However, because the Board can show that it had a valid basis for its actions, it is entitled to summary judgment on Gidron's retaliation claim as well.

For purposes of Title VII's anti-retaliation provision, an "adverse employment action" includes "any action that 'could well dissuade a reasonable worker from making or supporting a charge

of discrimination.'" <u>Patane v. Clark</u>, __ F.3d __, 2007 WL
4179838 at *7 (2d Cir. Nov. 28, 2007) (quoting <u>Burlington N. &</u>
<u>Santa Fe Ry. Co. v. White</u>, __ U.S. __, 126 S. Ct. 2405, 2409
(2006)). The only action taken by the Board that could be
considered an adverse employment action was its refusal to rehire
Gidron after his resignation.[15] Gidron had informally resigned
from his job as a school aide twice before, but the Board had

_____

[15] It should be noted that the termination of Gidron's
employment as a school aide cannot be considered an adverse
employment action by the Board, because Gidron's resignation was
entirely voluntary. Gidron has acknowledged that he resigned in
order to make himself eligible for a paraprofessional position.
Gidron Dep. at 62. Gidron's resignation was not a "constructive
termination" because there is no evidence that his employer
"deliberately and discriminatorily created work conditions so
intolerable that a reasonable person in [Gidron's] position would
have felt compelled to resign." <u>Schiano v. Quality Payroll</u>
<u>Systems, Inc.</u>, 445 F.3d 597, 608 n.9 (2d Cir. 2006) (citation and
quotation marks omitted). In fact, as the Board points out in
its opening brief, Principal Little tried to discourage Gidron
from resigning, because she knew there were no paraprofessional
positions available and Gidron was "one of my better School
Aides." Little Decl. ¶ 29.
    Gidron has also alleged that his supervisors, Principal
Little and Ms. Fairley, "retaliated" against him as a result of
his refusal to accept additional hours in the "accountability"
position. Gidron Dep. at 108-09. Gidron's only support for this
claim is that he "was getting letters in my file." Gidron Dep.
at 109. This testimony appears to refer to Gidron's periodic
evaluations, which as noted above cited his failure to report
absences on time but generally rated him as a "satisfactory"
employee. The evidence suggests that these negative evaluations
were prompted by legitimate concerns with Gidron's work
performance and were unrelated to his refusal to take on the
position offered by Little and Fairley. Nonetheless, these
claims cannot support a prima facie case for retaliation under
Title VII because, even accepting Gidron's allegations as true,
these negative evaluations were not prompted by any activity that
is protected under Title VII.

rehired him after both of these earlier resignations.  Gidron

Dep. at 63.  Therefore, Gidron could have reasonably expected

that he would be allowed to rescind his September 2004

resignation as well.  Under the circumstances, a reasonable

employee in Gidron's position might be "dissuaded . . . from

making or supporting a charge of discrimination" if he knew that

such charges would harm his ability to leave his job and then

return to it in the future.  <u>Kessler v. Westchester County Dep't</u>

<u>of Social Services</u>, 461 F.3d 199, 207 (2d Cir. 2006) (quoting

<u>Burlington</u>, 126 S. Ct. at 2415).  <u>See</u> <u>also</u> <u>Sundaram v. Brookhaven</u>

<u>Nat'l Labs.</u>, 424 F. Supp. 2d 545, 583 (E.D.N.Y. 2006) (viewing

refusal to rehire as an adverse employment action when evaluating

a Title VII retaliation claim).

There is also some evidence that Gidron engaged in protected

activity prior to the Board's December 2004 decision to refuse to

reinstate him as a school aide.  In particular, on November 10,

2004 Gidron faxed a letter to Schools Chancellor Joel Klein

complaining of "sexual discrimination" at the school where he

worked.  Compl. Ex. 1 at 56.  Construing the facts in the best

light possible for the plaintiff, this letter could have put the

Board on notice of Gidron's allegations of gender

discrimination.[16]  Finally, Gidron may establish causation

---

[16] Although Gidron is given the benefit of the doubt under
the circumstances, it remains unclear that his actions <u>actually</u>
put his supervisors, or any other individuals who made decisions

indirectly by pointing to the short period of time between his complaints to the Board and the decision not to rehire him.  See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 167 (2d Cir. 2006) (stating that a lapse of weeks between protected activity and adverse employment action "is sufficient to support an allegation of a causal connection strong enough to survive summary judgment"); Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 447 (2d Cir. 1999) (applying indirect causation in Title VII retaliation case).  Therefore, for the purpose of surviving a motion for summary judgment, and particularly in light of Gidron's pro se status, Gidron has provided the minimal evidence required to satisfy this prima facie case.[17]

Once Gidron establishes a prima facie case, however, the

_____

about his employment, on notice of his discrimination complaints, as required by the second prong of this prima facie case.  See Galdieri-Ambrosini v. Nat'l Realty & Development Corp., 136 F.3d 276, 292 (2d Cir. 1998).  Instead, the evidence suggests that, until he began contacting outside authorities in an attempt to rescind his September 2004 resignation, Gidron's long history of complaints to his supervisors and district personnel had focused solely on his failed attempts to become a paraprofessional and his other workplace disputes.  See, e.g., Compl. Ex. 1 at 15 (March 31, 2003 letter to Principal Little complaining of inability to become paraprofessional but making no allegations of gender discrimination); Compl. Ex. 2 at 3 (September 15, 2004 resignation letter, which also complains of inability to become a paraprofessional but contains no allegations of gender discrimination).

[17] It bears mentioning that Gidron's EEOC complaint cannot form the foundation of a retaliation claim, because it post-dates the Board's decision not to re-hire Gidron.

burden shifts to allow the Board to show that it had a legitimate and non-retaliatory basis for its actions. <u>Richardson</u>, 180 F.3d at 443. The Board has met this burden. The record includes ample evidence that the Board refused to rehire Gidron for legitimate and non-retaliatory reasons. Specifically, the evidence fully supports the Board's claim that Gidron was not rehired because of his inappropriate behavior, such as his placement of numerous objectionable calls in the middle of the night to the Board's offices. <u>See</u> Peeples Decl. ¶ 18.

The burden now shifts to Gidron to show that the Board's explanation is pretextual. <u>Richardson</u>, 180 F.3d at 443. Gidron has provided no evidence to suggest that the Board's actions were anything but legitimate.

Therefore, because the Board has established that it had a valid and non-retaliatory basis for its refusal to rehire Gidron, and Gidron cannot show that the Board's stated reasons are a pretext for unlawful retaliation, the Board is entitled to summary judgment on Gidron's retaliation claim.

**Conclusion**

Defendant's motion for summary judgment is granted on all claims. Therefore, plaintiff's complaint must be dismissed in its entirety. The Clerk of the Court is directed to close the case.


Dated:   Brooklyn, New York
         December 26, 2007


                                  SO ORDERED:


                                  _____/s/_____
                                  David G. Trager
                                  United States District Judge